United States District Court
Southern District of Texas
**ENTERED**
April 18, 2025
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | Case No. 5:23-CR-01168-1 |
| | § | |
| MICHAEL AVERY HOCHMAN | § | |

## REPORT AND RECOMMENDATION

Pending before the Court is Defendant's Motion to Suppress. (Dkt. No. 105). The Government filed a response opposing the motion. (Dkt. No. 111). Pursuant to 28 U.S.C. § 636(b)(1)(A) and Rule 59(b) of the Federal Rules of Criminal Procedure, the motion was referred to the undersigned for determination.

On February 25 and March 3, 2025, the Court held an evidentiary hearing on the motion and the parties presented witnesses and arguments.

As a preliminary matter to these motions, Defendant's Motion to Adopt and Convert to a Motion to Suppress Motions and Related Pleadings filed in Misc. No. 5:19-mc-894 (Dkt. No. 66) and Defendant's Amended Motion to Adopt and Convert to a Motion to Suppress (Dkt. No. 84) are herein **GRANTED**.[1] Furthermore, after a careful review of the pleadings, testimony, and applicable law, the undersigned recommends Defendant's Motion to Suppress (Dkt. No. 105) should be **GRANTED**.[2]

[1] Because these two motions are non-dispositive and do not resolve the present case, the undersigned rules directly on these motions pursuant to Fed. R. Crim. P. 59(a); *see also Ramirez v. Davis*, No. 7:18-CV-386, 2019 WL 4454399, at *1, n.1 (S.D. Tex. July 22, 2019) ("In general, a magistrate judge may rule directly on non-dispositive matters but may make only recommendations as to dispositive matters."), *report and recommendation adopted,* No. CV M-18-386, 2019 WL 4451372 (S.D. Tex. Sept. 17, 2019).

[2] Because a Motion to Suppress is considered a dispositive motion, the undersigned makes the following recommendation pursuant to Fed. R. Crim. P. 59(b).

## I. BACKGROUND

On September 27, 2018, a federal magistrate judge issued a warrant authorizing FBI agents to search "Laredo Laser and Surgery ... located at 5313 McPherson Road, Laredo, Texas 78041" in connection to a suspected health care fraud scheme. (Dkt. No. 105-1 at 11 (Search Warrant-Attachment A)). On October 2, 2018, FBI agents executed the search warrant at 5313 McPherson Road. (*Id.* at 9). Thereafter, on September 27, 2023, Defendant, Michael A. Hochman, was indicted by a grand jury out of the Laredo Division on Count 1: Conspiracy to commit health care fraud from on or about January 2013 through December 2019 pursuant to 18 U.S.C. § 1349 and Counts 2-5: Engaging in monetary transactions in property derived from specified unlawful activity from various dates specified in the indictment. (Dkt. No. 1 at 7-11).

Defendant is a physician specialist in ophthalmology licensed to practice medicine in Texas and owns and operates Michael A. Hochman, MD, PA, and Laredo Laser & Surgery, Ltd., two medical businesses in Laredo, Texas. (Dkt. No. 1 at 1). The Government alleges Defendant engaged in a conspiracy to defraud Medicaid, Medicare, and Tricare, which are federally funded health care benefit programs. (*Id.* at 2). The Government alleges Defendant would falsely diagnose vulnerable patients with ophthalmological diseases for the sole purpose of increasing his profits. (*Id.* at 8). This was done by performing repetitive and unnecessary medical procedures and unbundling billing codes. (*Id.*). Defendant and co-conspirators would falsify medical records to create the appearance that certain procedures were necessary and that certain procedures were performed. (*Id.*). Further, at least one employee was paid via a bonus structure if they billed certain procedures more often. (*Id.* at 1). In all, the Government alleges Defendant defrauded the federally funded health care programs of approximately thirteen (13) million dollars. (*Id.* at 9).[3]

---

[3] As set out within the indictment, the Government believes that from January 2013 to December 2019 the Defendant and the co-conspirators caused "approximately $402,536,174 million in claims to be submitted

Defendant moved to suppress evidence derived from the 2018 search alleging FBI agents exceeded the scope of the warrant when they searched Michael A. Hochman, MD, PA, which is a separate business located within the building at 5313 McPherson Road. (Dkt. No. 105). Defendant argues the search warrant only authorized agents to search Laredo Laser and Surgery, Ltd., which is a different business housed at the same address, and that the agents objectively knew or should have known they exceeded the warrant's authority because it was evident the building housed two separate business entities and because Defendant himself informed the agents, at the time of execution, that they were unauthorized to search Michael A. Hochman, MD, PA. (*Id.*). The Government counters that agents believed the search warrant authorized the search of the entire premises, including the separate medical practice not listed on the warrant, and there were no indicators known to the agents that led them to believe the building housed two separate businesses. (Dkt. No. 111).

What transpired during the search is in dispute, and Government and Defendant presented conflicting accounts at the suppression hearing. FBI Special Agent Jaime Terry ("S/A Terry") testified she was the lead agent in the investigation and executed the search warrant. S/A Terry testified she did not see any signs or information that showed there were two separate clinics at the location, instead she believed it was one building all under the control of Defendant. She testified this belief arose from the signage outside the building, surveillance, and various records.[4]

---

to Medicare, Medicaid, and Tricare which resulted in approximately $13,317,914 million being paid to Dr. Hochman and his affiliated entities." (Dkt. No. 1 at 9 (¶18(h))).

[4] S/A Terry testified the property records showed the building had one owner, an entity named Avery Holdings, which was owned by Michael Hochman. (Hrn'g Tr. at 12). She also testified there were no billing or property documents, nor any signs on the building that showed separate suites. (*Id.* at 14-15).

S/A Terry testified that on the day of the search she entered the building five minutes after the first group of agents made entrance through the "side door"[5] and proceeded to the Defendant's office where she presented him with the warrant. S/A Terry denied the Defendant ever informed her that Michael Hochman, MD, PA, was a separate business entity and the only thing Defendant said to her was that they were inside his own "personal office."[6] Thus, agents searched the entire premises at 5313 McPherson.

Hochman testified at the suppression hearing that on the day of the search he arrived at his medical practice, Michael Hochman, MD, PA, where he was informed by staff the FBI was raiding his business. Hochman testified he was then approached by agents that demanded he take them to his office. Hochman informed agents they were inside his medical office, but agents insisted he take them to his private personal office. At that time, Hochman had a small private office in the Laredo Laser and Surgery clinic, so he took the agents there. Hochman requested to see the warrant, but was told another agent was on the way with it. Hochman testified he waited for more than thirty minutes before S/A Terry arrived with said warrant. At that time, he reviewed the warrant, and informed S/A Terry that the warrant only authorized the search of Laredo Laser and Surgery, and that Michael Hochman, MD, PA, was a separate clinic not listed on the warrant. Hochman testified that S/A Terry disregarded his assertion and continued the search of the entire premises anyway. Hochman also testified his cellular phone was searched.

---

[5] Throughout her testimony, S/A Terry refers to a "side door," but this "side door" is actually towards the back of the building, and it is the entrance into Michael Hochman, MD, PA, and has that name written on the door. There is a separate side door that is always locked and leads directly into LLS and is utilized as an "emergency exit" for the medical facility.

[6] The Government did not present any additional witnesses to support S/A Terry's statements. *See United States v. Ritter*, 416 F.3d 256, 268 (3d Cir. 2005) (noting the court will not supply testimony the government failed to elicit and "the government must live with its decision to offer only one witness" in making a record of the events).

Per review of the Evidence Case book of the investigation, federal agents arrived at 8:05 a.m.; an agent sketched the area for record-keeping purposes at 8:12 a.m.; and federal agents began the search at 8:35 a.m. (Dkt. No. 114-1 at 1, 4 (D.E. No. 1)). The search of Defendant's cellular phone occurred at 8:55 a.m. (Dkt. No. 117-6 (D.E. No. 27)).

## FOURTH AMENDMENT

The Fourth Amendment provides foundational protection to citizens from unreasonable governmental intrusions. The Fourth Amendment reads:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.[7]

Based on this amendment of the Bill of Rights, warrants must describe with particularity what is to be searched. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). This requirement limits the scope of a warrant and guarantees "the search will be *carefully tailored* to its justifications, and will not take on the character of wide-ranging exploratory searches the Framers intended to prohibit." *Id.* (emphasis added). When a search is conducted pursuant to a warrant, two constitutional questions may arise: "one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed." *Id.* (citing *Dalia v. United*

[7] As succinctly noted by one district court:

> The Fourth Amendment contains just fifty-four words. It prohibits the government from conducting unreasonable searches and seizures – and requires that, to obtain a warrant, the government official must, under oath, establish probable cause to execute the warrant, and describe with particularity the place to be searched and the persons to be seized. These concepts are simple.

*United States v. Rogers*, No. 1:09CR139-M-S, 2013 WL 4350946, at *3 (N.D. Miss. Feb. 4, 2013).

*States*, 441 U.S. 238, 258 (1979)). Thus, even when a warrant is valid, evidence may be suppressed when the warrant is executed in an unreasonable manner. *United States v. Hall*, No. 3:18-CR-0623-S, 2023 WL 2674855, at *8 (N.D. Tex. Mar. 29, 2023) (citing *United States v. Jarman*, 847 F.3d 259, 266 (5th Cir. 2017)).

The present case deals with the second question. There is no dispute that the warrant in question was valid, and it authorized the agents to search Laredo Laser and Surgery. The warrant was issued by a magistrate judge based on his finding of probable cause to search Laredo Laser and Surgery. The dispute centers around whether the agents exceeded the scope of the warrant in also searching Michael Hochman, MD, PA, the separate clinic in the building, since "it is a clearly established constitutional norm that officers must immediately terminate a search upon realizing it is the incorrect location[.]" *Thomas v. Williams*, 719 F.App'x 346, 352 (5th Cir. 2018) (relying on *Garrison* and Fifth Circuit precedent as establishing this norm).

As mentioned, this case revolves around conflicting accounts surrounding the execution of the warrant. Government contends agents never realized there was a separate business in the premises and, regardless of this fact, Defendant essentially owned and operated both medical enterprises being housed within the same building, therefore, the warrant covered search of the entire building and surrounding premises. Defendant asserts it was obvious there were two businesses in the location, and in any event, Defendant himself told S/A Terry the warrant did not authorize the search of the entire building.

## II. ANALYSIS

*Maryland v. Garrison* informs this Court's analysis. 480 U.S. 79 (1987). In *Garrison*, officers executed a warrant to search "2036 Park Avenue third floor apartment." *Id.* at 80. Initially, officers believed the third floor had one apartment unit and immediately began their

search. *Id.* at 81. As it turned out, the third floor had two different apartment units. *Id.* When the officers realized their mistake, they stopped the search but had already seized contraband from the second apartment unit. *Id.* The Supreme Court noted, "[i]f the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search" to the correct apartment. *Id.* at 86. More on point, the Court made clear the officers "were required to discontinue the search…as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." *Id.* at 87.

### A. <u>The Premises in Question</u>

The execution of the warrant for Laredo Laser and Surgery at 5313 McPherson Rd. falls within this holding. The search warrant particularly described the place to be searched:

> Laredo Laser and Surgery is located at 5313 McPherson Road, Laredo, Texas 78041. 'Laredo Laser and Surgery' is identified on the outside of the location. Laredo Laser and Surgery is a standalone tan building with dark brown trim, facing McPherson Road, Laredo, Texas.

(Dkt. No. 105-1 at 11). The warrant also included two pictures depicting the front of the 5313 McPherson building and an aerial view. (*Id.*). Throughout both the search warrant and the search warrant application Laredo Laser and Surgery, 5313 McPherson Road, Laredo, Texas 78041 is referred to as "Target Location." (*Id.* at 12).[8]

The premises at 5313 McPherson Rd. house two distinct medical businesses. The front of the building is Laredo Laser and Surgery ("LLS"), which is an ambulatory surgical clinic, where various doctors provide surgical procedures to patients as an alternative to hospitals. Hochman is

[8] S/A Terry was not the search warrant affiant. The search warrant affiant was FBI S/A Gillespie. S/A Terry was the lead agent in charge of this operation.

the medical director of LLS and has a private office there. LLS occupies around seventy percent of the building and has a main entrance at the front of the building and a side door for fire evacuation purposes that always remains locked. The back thirty percent of the building is a separate clinic, Michael Hochman, MD, PA, ("MDPA"), where Hochman provides ophthalmological services to his patients. MDPA has its own entrance, and the door prominently displays the clinic's name. Inside, there is one door that connects the clinics. This door remains locked at all times and has signage reading "authorized personnel only." The following graphic is a schematic of the building kept pursuant to fire safety codes and displayed within the building at the fire exits, with highlights by the Court:



As shown, the schematic clearly differentiates between LLS and MDPA clinics. The red box highlights the only door connecting the clinics. In yellow, the Court has notated the schematic indicators delineating the area for the MDPA clinic and its entrances. The yellow box highlights the "side door," which is the main entrance into MDPA. In blue, one can see the area known as LLS and its entrances. The agents had this schematic available before effectuating the warrant. As shown above, the agents used this exact schematic when inventorying the evidence collected.[9] The schematic alone shows the building at 5313 McPherson houses two separate entities or at least indicates it could. Outside the building, there are various signs that further indicate two entities may be housed at the specified address. First, included with the warrant, there is a picture of the front of the building. This picture shows a sign reading "Laredo Laser and Surgery" and upon closer inspection, a sign indicating the entrance to MDPA is in the back:




The marquee sign at the front of the business also lists both entities:

---

[9] The testimony presented at the suppression hearing indicated that agents used the diagram of the building to identify separate rooms by letter, from A to FFF. (Hrn'g Tr. at 54). The rooms were marked as a key an agent could utilize to mark where items were seized in the course of the search. (*Id.*; *see also* Dkt. No. 114-1 at 6-14 (Evidence Recovery Log)). "A" was used to mark a separate storage building located on the premises that was searched, and several files were seized. (Hrn'g Tr. at 31, 54; see *also* Dkt. No. 114-2 at 2 (Diagram/Sketch of separate storage room/building)). Said diagram appears to have been made at 8:12 a.m. before the search began. (Dkt. No. 114-1 at 4 (D.E. No. 1)).




In the back of the building, there is signage indicating the entrance into MDPA. Mainly, the entrance prominently displays the clinic's name:




To the right of this entrance, in the back, there is a small outbuilding used for file storage:



Before agents executed the search warrant, they conducted surveillance on the premises and these signs were visible. Agents were put on notice at the time they arrived to execute the warrant that two separate entities existed at 5313 McPherson, and since the warrant specified the target location as Laredo Laser and Surgery, the agents were required to limit their search to LLS. Even then, if the agents believed they had permission to search the whole building, the agents were directly confronted with the idea the building housed two separate business enterprises.

**B. Testimony of the Relevant Parties**

At the evidentiary hearing, Hochman and S/A Terry directly contradicted each other on various points, but most importantly about whether Hochman informed S/A Terry the property at 5313 McPherson housed two separate businesses. Court finds Hochman's testimony credible. Court also finds S/A Terry's testimony presented inconsistencies that warranted further corroboration. Such inconsistencies will be discussed below.

Hochman testified as follows: On October 2, 2018, he arrived at his medical practice, Michael Hochman, MD, PA, around 8:00 a.m. (Hrn'g Tr. at 104). When he arrived, his staff informed him the FBI was there. (*Id.* at 105). Hochman spoke to the agents and requested they show him the warrant. (*Id.* at 105-06). The agents told Hochman a different agent would arrive with the warrant soon but was currently stuck in traffic. (*Id.* at 106.) After more than thirty minutes, S/A Terry arrived. (*Id.* at 107). By then, Hochman was inside his personal office on the LLS side of the building. (*Id.*). Hochman testified he asked agents for permission to use the bathroom, but was told he could only use the bathroom if he gave the agents his cell phone. (*Id.* at 108). He also testified that he did not receive his phone back when he returned.[10] (*Id.* at 109).

---

[10] Hochman would eventually consent to search of his phone by federal agents. (Dkt. No. 105-1 at 3); (Hrn'g Tr. 108-09). The extraction of Defendant's cellular phone's contents by law enforcement began at 8:55 a.m. and ended at 9:06 a.m. (Dkt. No. 117-6 (D.E. No. 27)).

Afterwards, S/A Terry presented Hochman with the warrant, Hochman told S/A Terry the warrant specified Laredo Laser was the place to be searched and did not allow the agents to search his medical clinic MDPA. (*Id.* at 110). S/A Terry dismissed Hochman's assertion and continued the search of the whole building at 5313 McPherson. (*Id.*).

Hochman clarified the building layout and explained LLS has a front entrance and an unmarked side door that remains locked at all times and has signage indicating so on the inside. (*Id.* at 101). Hochman explained there is only one door within the building that connects LLS and MDPA, this door is locked at all times. (*Id.* at 102, 116-17). Hochman also explained LLS is essentially a day surgery center with its own entrance, waiting room, and staff. (*Id.* at 111-12). Hochman testified that if a patient required surgery the same day they visited his MDPA clinic, the patient would be instructed to exit the clinic and enter LLS through its separate front door. (*Id.* at 112). At the time of the search, between 5-10 other doctors performed services out of LLS. (*Id.* at 113). Hochman testified there are visibly apparent differences between LLS and MDPA. (*Id.* at 114). Hochman also pointed to the sign in the front of the building that instructs the MDPA entrance is in the back. (*Id.* at 121).

Hochman's testimony was consistent with his assertions throughout pleadings and with his own affidavit completed back in 2019. (D.E. No. 13); (*see also* Case No. 5:18-mj-0948, Dkt. Nos. 5-1, 10-1). Hochman's employee, Rosana Cantu, also provided an affidavit supporting Hochman's version of events. (D.E. No. 12).[11]

S/A Terry testified that prior to executing the search warrant, her team interviewed patients, former employees, and surveilled the business several times. (Hrn'g Tr. at 11). S/A Terry testified

---

[11] Hearsay is admissible at suppression hearings and the Court considers the reliability of this evidence as the ultimate fact finder. *See United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); *see also United States v. Escalon*, 744 F.App'x 238, 239 (5th Cir. 2018).

she believed 5313 McPherson was used by Hochman to provide various ophthalmology related services and property records showed the premises were owned by Avery Holdings, an LLC registered to Hochman. (*Id.* at 12). S/A Terry testified there was nothing on the building that alerted to separate suites. (*Id.* at 15). During surveillance, S/A Terry observed a vehicle registered to Hochman in the parking lot and noticed two entrances in the building: one in the front and one on the "side" (back of building). (*Id.*). S/A Terry testified she did not believe the entrance into LLS was marked, but she did observe the "side entrance" had "Michael Hochman, MD, PA" on the door. (*Id.* at 17).

On the day of the search, S/A Terry testified she was across the building and entered five minutes after the initial agents made entry, where she met Hochman in his office and showed him the search warrant. (Hrn'g Tr. at 20). As to the conversation with Hochman, S/A Terry remembers he said something like "this was my personal office" and she believed he did patient charting there. (*Id.* at 25). S/A Terry denied Hochman told her MDPA and LLS were separate entities. (*Id.*). S/A Terry testified she remembers there may have been a sign near a door that read "authorized personnel." (*Id.* at 27); (Dkt. No. 105-4 at 2 (D.E. No. 5) (depicting "authorized personnel only" sign)).

S/A Terry also testified that the entire premises at 5313 McPherson were searched, including an outbuilding utilized to store files, which she believed was listed on the warrant but could not be certain. (*Id.* at 32). The search started around 8:00 a.m. and agents entered the building through the "side door" that read "Michael Hochman, MD, PA" and S/A Terry could not remember if agents entered through the front as well. (*Id.* at 42, 47). Notably, S/A Terry conceded the fire alarm schematic depicted two separate entities, specifically the front part of the building was labeled "LLS", and the back part was labeled "MDPA" and that she read the schematic that

way. (*Id.* at 65-66).[12] Yet, S/A Terry testified she believed it was all one business because Hochman owned the building, was the top Medicaid provider for LLS, and had several National Provider Identifier numbers at that address. (*Id.* at 76).

Throughout S/A Terry's testimony, she described MDPA entrance as a "side door", but the entrance is in the back, and there is a different side door that leads only into LLS, which remains locked. S/A Terry also testified that property records showed the owner of 5313 McPherson was Avery Holdings, which listed Hochman as the registered agent. But the search warrant application stated property records showed 5313 McPherson was owned by three entities: Laredo Laser & Surgery, Michael Hochman, MD, PA, and Avery Holdings. (Dkt. No. 114-8 at 29 (D.E No. 7-B)).[13] This is significant because it further shows agents had some reason to believe there was more than one entity at the building in 5313 McPherson and it adds to the inconsistencies in S/A Terry's testimony.

S/A Terry testified there were no signs at all indicating the building had more than one business. But, as explained above, the agents were aware of various signs surrounding the building that should have alerted them to the possibility the building had two clinics. First, property records

---

[12] Agent Terry was questioned by Hochman's counsel regarding the schematic used to map out the search of the building as follows:

> Q: And on that schematic, by the way, it does show, does it not, there are two different professional operations in that building? To the left is Laredo Laser and Surgery, which is fronting McPherson. Correct?
> A: Correct.
> Q: And to the right is Michael Hochman, M.D. P.A. Correct?
> A: Correct. That's what it shows, yes.

(Hrn'g Tr. at 65-66).

[13] "Property records reflect Michael A. Hochman MD. PA, Laredo Laser and Surgery LTD, and Avery Medical A. LLC are the registered owners of 5313 McPherson Road, Laredo, Texas 78041 also known as the Target Location. The property was purchased in the name of Avery Holdings in 2003, which **HOCHMAN** was the registered agent." (Dkt. No. 114-8 at 29 (D.E. No. 8) (Search Warrant Affidavit, ¶46 (emphasis original))).

showed both LLS and MDPA were listed owners of the building. Second, at the front of the building, below a sign reading "Laredo Laser and Surgery" was a sign clearly indicating the entrance for Michael Hochman, MD, PA was towards the back of the building. And these signs were observed by agents because a picture of the front of the building was attached to the warrant, and because S/A Terry testified they conducted surveillance of the premises. Third, at the MDPA entrance, there was a large sign above the door reading "Michael Hochman, MD, PA" and the same was written on the actual door. At the time of execution, these open and publicly visible signs reasonably should have alerted agents that two businesses were within the building, and that the warrant obtained only authorized the search of one of those businesses.

### C. Evidence Weighs in Favor of Defendant's Claim

At the execution of the warrant, agents had available the fire safety schematic providing a blueprint of the premises at 5313 McPherson. The schematic clearly depicts there are two entities in the building. In her testimony, S/A Terry conceded this point when she acknowledged the schematic showed two separate entities. The agents used this schematic to map out where they collected evidence from, thus they were constantly presented with an indicator that the building may house two businesses. S/A Terry could not remember if agents entered through the front and back doors, but Government pleadings assert agents entered simultaneously through both doors. (Dkt. No. 111). If agents entered through both doors, they clearly should have observed both the signs on the front alerting two separate businesses and the signs in the back that alerted them to the same. If agents only entered through the back door, they were directly confronted with the large sign indicating "Michael Hochman, MD, PA" was there. Either way, before entering the premises agents would have observed the surroundings and noticed the signs. Furthermore, an

agent completed a sketch of the property before the search began at 8:12 a.m. (Dkt. No. 114-1 at 1, 4 (D.E. No. 1))

S/A Terry testified she entered the building about five minutes after the search began, and she waited across the street facing McPherson. In support, Government presented a handwritten sign-in log for the day of the search, which showed S/A Terry signed in at 8:12 am, and a post-testimony assertion the reason S/A Terry entered later was because she was pregnant at the time. (Dkt. 118-1 (G.E. No. 9)); (*see also* Dkt. No. 117 at 9 (operations order indicating that "[d]ue to SA Terry's pregnancy she will not be on the initial entry team.")). Hochman testified S/A Terry did not enter the premises until after more than thirty minutes, and then presented him with the warrant and asked him to copy his phone. In support, Hochman provided a log demonstrating his phone was extracted around 8:55 a.m. (Dkt. No. 117-6 (D.E. No. 27)). S/A Terry testified she believed the search warrant included language permitting the search of any outbuildings, but the search warrant did not have any of that language.[14]

Further, Government pleadings directly contradict S/A Terry's testimony at the hearing. (Dkt. No. 111). At the hearing, S/A Terry testified Hochman never told her MDPA was a separate business than LLS, and that instead he may have told her the room they were in was his personal office. Yet, the Government stated in its response brief that "[h]ardcopy files were seized from an area the defendant asserted a *separate business* from Laredo Laser and Surgery" and that the agents' "response to the defendant's assertion *at the time* was and continues to be" the search warrant authorized the search of the whole building. (Dkt. No. 111 at 3 (emphasis added)).[15]

---

[14] *See supra* n.9 in reference to storage facility located on premises and searched by agents. The search of that separate building became an issue when arguments were heard in this matter on March 3, 2025; as such, this Report and Recommendation will address that issue as well. *See infra* n. 19.

[15] Notably, this pleading was repurposed into Government's opposition to Defendant's motion to suppress but was originally a reply in a separate miscellaneous action dealing with the search of the premises,

At the hearing, Government argued the warrant included the entire premises at 5313 McPherson because they believed everything was one business owned and operated by Hochman, there was no evidence indicating the building housed two businesses, and Hochman never told S/A Terry about the two distinct businesses. Yet, Government conceded that if Hochman was believed, and he did in fact tell S/A Terry 5313 McPherson had two business entities, agents should have stopped the search. (FTR Log Notes, 2:00 Afternoon Docket, March 3, 2025, 3:26:05-3:27:05 p.m.). Specifically, Government stated if a defendant were to make such an assertion during a search, the agents should have conducted their due diligence in corroborating the statement, and if it appeared there was a chance the building had two businesses, the agents should stop the search and fix the warrant to include both businesses. (*Id.*). But Government said Hochman was not to be believed, so S/A Terry and her team had no reason to believe there were two businesses. As explained above, once agents arrived at 5313 McPherson to execute the warrant it was readily apparent 5313 McPherson housed two medical businesses. The federal agents had a schematic available differentiating the entities, there were signs outside the building, the records available listed two entities at that address, the entities had different phone numbers, and Hochman advised S/A Terry that the businesses were separate. Thus, at the time of execution, it would have been apparent two distinct businesses were in the building.

---

Defendant's request for return of seized property, and disclosure of the search warrant affidavit. This is significant because this reply was filed in May 2019 which was closer in time to the search. At that time, Government was addressing issue of anomalous jurisdiction, which gives federal district courts the power to order suppression or return of seized property even though no indictment has been returned, and no criminal prosecution exists. *In re Grand Jury Proceedings*, 115 F.3d 1240, 1249 (5th Cir. 1997). Considering this portion of the reply was not edited, it appears that in 2019 Government acknowledged Hochman did in fact tell S/A Terry there were two separate businesses. This adds to the inconsistencies in Government's presentation of the execution of the search. (*See* Case No. 5:18-mj-0948, Dkt. No. 9 at 4).

In *United States v. Rogers*, the court found evidence presented supported the defendant's account and that cross-examination of the officer witnesses left them without credibility, ultimately granting the defendant's motion to suppress. No. 1:09-CR-139-M-S, 2013 WL 435946, at *5 (N.D. Miss. Feb. 4, 2013). Although the facts in that case are distinguishable, this credibility principle is equally applicable.[16] As explained, S/A Terry's version of events was directly contradicted by Hochman's, but S/A Terry had inconsistencies in her testimony that differentiated from the Government's own pleadings. During cross-examination, S/A Terry conceded some important details, such as what the schematic of the building depicted, and how S/A Terry read it. Plus, the Government itself conceded S/A Terry acted unreasonably if the Court credited Hochman's testimony.[17]

Evidently, the agents had many opportunities to realize the potential overbreadth of their search, stop the search, and abide by the Fourth Amendment by obtaining a second warrant. First, it became apparent that 5313 McPherson housed two distinct businesses at the time the agents executed the warrant. Upon the agents' arrival, the premises should have been observed, as they had been on previous occasions. S/A Terry waited across the street directly facing the front of the

---

[16] In *Rogers*, the court dealt with a motion to suppress where a defendant was charged with possession of a controlled substance with intent to distribute, where officers found a significant amount of drugs inside a red truck officers alleged was parked behind the house to be searched. *United States v. Rogers,* No. 1:09-CR-139-M-S, 2013 WL 435946, at *2-4 (N.D. Miss. Feb. 4, 2013). The court granted the motion to suppress because the evidence was found on a separate property significantly distant from the place to be searched and the officers heavily misrepresented this fact to the court. *Id.* In doing so, the court noted factors and discrepancies that left the officer witnesses without credibility, and that the evidence supported the defendant's view of events. This principle of assessing witness demeanor and the evidence presented in determining witness credibility is what is applicable in the present case.

[17] As an aside, the issue may be that the search occurred in October 2018 and is now being litigated in March/April 2025. In response to a question from the Court in regard to whether or not S/A Terry had reviewed patient files that may be utilized for trial, the agent noted that "I haven't been on this case for four years or so, so I'm not sure exactly how many files from that search are being used from trial." (Hrn'g Tr. at 90). The response reveals an unfamiliarity with the case due to the passing of time since that initial search in October 2018, and then the eventual prosecution in September 2023.

building before entering. Thus, S/A Terry observed the front of the building, which had a sign indicating Laredo Laser and Surgery was there, and a different sign indicating the entrance into MDPA was towards the back of the building. As agents proceeded to the back, they were faced with a large sign reading "Michael Hochman, MD, PA" with the same written on the glass door. Agents proceeded through that door and entered the MDPA clinic. Once inside, agents met Hochman's staff and eventually Hochman and ordered him to take them to his private office. Under those instructions, Hochman took the agents to the LLS side of the building, where he had an office due to his role as medical director. At this point, agents should have observed the differences between the interiors of both businesses. MDPA had wall décor and tile flooring while LLS had hospital grade vinyl flooring and blank white walls. The only door connecting both clinics was locked and neither side could unlock the door without a key.

Then, S/A Terry arrived and met Hochman inside his private office on the LLS side, having observed the outdoor signs and the indoor distinctions. S/A Terry and her team proceeded to search the entire building and documented their search on the fire exit schematic, which clearly depicted two separate businesses, as S/A Terry herself understood. Under these facts, agents were placed on notice at the time of execution that two separate entities were located within the building. This would have prompted a reasonable response to stop the search entirely or limit it to the LLS side of the building, because that is what the warrant authorized. *See Garrison*, 480 U.S. at 87, n. 11 ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." (quoting *Brinegar v. United States,* 338 U.S. 160 (1949))).

Second, Defendant Hochman specifically told S/A Terry that LLS and MDPA were different entities, and the warrant only authorized the search of LLS. Hochman's statement was corroborated by the objective evidence indicating two businesses were housed in the same building, as explained above. Plus, S/A Terry had additional information about what property records stated. All these facts, coupled with Hochman's assertion clearly alerted S/A Terry about the potential that agents were exceeding the warrant's scope. Further, Hochman's testimony about the conversation he had with S/A Terry has remained consistent since 2019 and supported by affidavits submitted near the time of the events. (*See* Case No. 5:18-mj-0948, Dkt. No. 5-1 at 3 (Defendant's affidavit stating, "After reading the warrant, I saw that the judge had not authorized searching my medical office and told Special Agent Terry that the warrant did not authorize them to search it, but only Laredo Laser and Surgery. I told them to leave but they refused.")); (Case No. 5:18-mj-0948, Dkt. No. 10-1 at 1-2). And, at one point, it appears the Government conceded Hochman informed S/A Terry about the two separate offices. (Case No. 5:18-mj-0948, Dkt. No. 9 at 4). At the hearing, Government argued otherwise, but even then, it acknowledged if Hochman was believed the agents acted unreasonably in continuing the search.

Thus, S/A Terry was put on notice that two separate businesses were in the building as soon as she attempted to execute the warrant. This belief was only heightened and became even more apparent by the time Hochman told S/A Terry directly that the warrant only authorized the search of one clinic. Because agents "were required to discontinue the search…as soon as they…were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant" continuing the search of Michael Hochman, MD, PA, was unreasonable. *Garrison*, 480 U.S. at 87.

### D. Government's Belief it is One Building, One Business

The Government argued the National Provider Identifier ("NPI") numbers show both LLS and MDPA list 5313 McPherson as the business address and both are owned and operated by Hochman, supporting their belief the building was all one entity under Hochman's control. (Dkt. No. 111 at 2). The Defendant argued the separate NPI numbers showed there were two businesses at 5313 McPherson as they listed different phone numbers and Hochman only has one NPI number in his capacity as a doctor, and the LLS NPI number is for medical hospital billing. (Dkt. No. 105 at 19); (Hrn'g Tr. at 71-76); (Dkt. Nos. 114-16; 114-17 (National Provider Identifiers Registry for Michael A. Hochman, M.D. & Laredo Laser & Surgery, LTD)). Although the businesses are operated principally by Defendant, the separate NPI numbers are similar to corporate charters, in that they reflect MDPA and LLS are operated as independent businesses for purposes of billing and operation despite having the same owner.

Government relies on *United States v. Palmer*, a case out of the Fourth Circuit, to argue the name LLS should be understood as referencing the entire building. (Dkt. No. 111 at 7-8 (citing *United States v. Palmer*, 667 F.2d 1118, 1119 (4th Cir. 1981))). In *Palmer*, FBI had a warrant to search the business "Carl's Carpet Mart" located within a business complex, next to other businesses. FBI agents searched the business "Miller-Arrington" instead, which was distinct from "Carl's Carpet Mart" and completely separated but within the same building as the noted carpet mart; in fact, the defendants were renting office space from Carl and paying their landline phone bill through Carl for their business (illegal booking/gambling enterprise). *Palmer*, 667 F.2d at 1119. Although the agents listed Carl's Carpet Mart as the place to be searched, their true intentions were to search the offices of Miller-Arrington all along, as suspected crimes were occurring in that business and agents had observed the suspects enter and exit only out of that

portion of the building. *Id.* at 1120. The court did not suppress evidence obtained from this search reasoning that a warrant specifying a place under its common designation, although technically incorrect, would be upheld. *Palmer* does not help the Government in the present case. Critically, in *Palmer*, the court accepted "Carl's Carpet Mart" as the business's common designation because the defendants signed a statement on the return of the warrant that specified Carl's Carpet Mart was indeed the place that was searched. *Id.* The Fourth Circuit treated this signed statement as an admission that "the search took place on the premises authorized in the search warrants." *Id.* On these facts, Palmer has no applicability in the present case because it has been disputed since the search that LLS and MDPA are separate and not one in the same.

Government also looks to *United States v. Aguirre*, a case from the Eleventh Circuit, to argue that the search warrant authorized the seizure of documents related to the ongoing investigation and that included records for both LLS and MDPA. (Dkt. No. 111 at 6 (citing *United States v. Aguirre*, 368 F.App'x 979 (11th Cir. 2010))). In *Aguirre*, the court declined to suppress evidence obtained from the defendant's tax business office which was within the business and property described in the warrant even though the defendant asserted his office was separate from the other tax business that was subject of the warrant. *Aguirre*, 368 F.App'x at 982. This case is distinguishable. Importantly, the defendant did not arrive and inform agents that his office was separate until the officers were already searching his office and had already found documents related to the tax business subject to the search. *Id.* at 982. Yet, once informed, the agent in charge paused to verify there were no signs differentiating the businesses by name and that all doors were unlocked. *Id.* at 982-83. Further, defendant's separate tax business had its own distinct address different from the address searched by agents, and the agents could not have observed from surveillance that defendant had a "satellite" office for that business within the premises to be

searched as well. *Id.* at 988. Thus, *Aguirre* is not instructional in the present case because unlike that case Hochman informed agents of the presence of two businesses at the onset, before the search took place. Plus, the premises had two distinct businesses not simply one personal office dedicated to a separate business, all doors connecting the businesses were locked, there were clear signs differentiating the names of the businesses, and the agents did not stop to verify the statement.

At the hearing on March 3, 2025, the Government also argued attachment B of the search warrant authorized the search of the entire building because it describes the items to be seized as files and other documents connected to Hochman. (FTR Log Notes, 2:00 Afternoon Docket, March 3, 2025, 2:55:40-2:57:33 p.m.); (Hrn'g Tr. at 28). The undersigned finds this argument unpersuasive because this perspective mischaracterizes the construction of a search warrant. Specifically, a search warrant typically contains two attachments (A and B). Attachment A describes the premises to be searched, and it specifies to the agents what places they are allowed to enter and search. Whereas Attachment B specifies the items to be seized. In other words, it adds necessary particularity to the warrant by describing the items agents are allowed to collect as evidence, once inside the location as described by attachment A, but it does not allow agents to enter new locations. *Cf. United States v. Aguirre*, 664 F.3d 606, 614 (5th Cir. 2011) (noting that "[t]he description of the warrant must be such that a reasonable officer would know what items he is permitted to seize." (citing *Steele v. United States*, 267 U.S. 498, 503-04 (1925))). Here, attachment A described the premises to be searched as Laredo Laser and Surgery at 5313 McPherson Road, Laredo, Texas.[18] This means the search warrant was restricted to LLS as the description of premises to be searched. Attachment B is five pages of listed "items to be seized" and include various types of records related to LLS. Government's argument hinges on the

[18] *See supra* p.7 for full text of search warrant attachment A.

language specifying the items to be seized as "items used by for, or on behalf of Laredo Laser and Surgery ... and any affiliated entities, individuals, owners..." and argues such language encompasses MDPA as it is an affiliated entity also owned by Hochman. (Dkt. No. 105-1 at 12). However, this attachment only speaks to the items that can be seized from within the premises to be searched, which were identified as Laredo Laser and Surgery. Thus, Government cannot rely on this basis to make an unreasonable search a permissible one.

In summary, *United States v. Muse* presents a useful comparison. In *Muse*, the court granted a motion to suppress when FBI agents exceeded the scope of the warrant by searching suite 218A when the warrant only authorized the search of suite 218. 729 F.Supp.2d 905 (E.D. Mich. 2010). The agent testified she believed the search warrant authorized the search of both suites, and the government argued there was probable cause evidence of the crimes would also be found in suite 218A. *Id.* at 909. However, the court held no reasonable person could conclude both suites were part of the same unit because there was distinct signage, the door had the name of a different business, entry into suite 218A was restricted by a separate lock and key, and the record showed agents had constructive and actual notice the units were separate. *Id.* at 912. The same is true here. Although there was one door connecting both businesses, this door always remained locked on both sides, and there was plenty of evidence differentiating the businesses. Thus, federal agents acted unreasonably in continuing the search and should have stopped the search like the officers in *Garrison*.

## III. <u>EXCLUSIONARY RULE</u>

"The exclusionary rule prohibits introduction at trial of evidence obtained as the result of an illegal search or seizure." *United States v. Runyan*, 275 F.3d 449, 466 (5th Cir. 2001). Any evidence "derived from the exploitation of an illegal search or seizure" must also be suppressed as

"fruit of the poisonous tree." *United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) (citations omitted). Because the search warrant only authorized the search of Laredo Laser and Surgery, the search of Michael Hochman, MD, PA, was essentially warrantless. *Muse*, 729 F.Supp.2d at 912. Thus, all evidence seized from Michael Hochman, MD, PA, fell outside the scope of the warrant and must be suppressed. *See Horton v. California*, 496 U.S. 128, 140 (1990).

At the hearing, the Government raised for the first time the good faith exception. Under the good faith exception to the exclusionary rule, evidence will not be suppressed when law enforcement acts "in good faith and in the reasonable, though mistaken, belief that [their actions] were authorized." *United States v. De Leon-Reyna*, 930 F.2d 396, 400 (5th Cir. 1991) (quotations omitted). In the Fifth Circuit, the good faith exception applies to warrantless actions. *Id.* The key to this exception is that "evidence obtained by law enforcement officials acting in objectively reasonable good-faith reliance upon a search warrant is admissible in the prosecution's case-in-chief even though the affidavit on which the warrant was based was insufficient to establish probable cause." *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1130 (5th Cir. 1997) (citations omitted).

Here, there is no dispute the search of LLS was authorized and based on probable cause. Any evidence obtained from LLS side of the building at 5313 McPherson is undoubtedly admissible. But the search of MDPA was unauthorized and not supported by a warrant. In effect, the search and seizure of evidence within MDPA was warrantless. As detailed, it was unreasonable for federal agents to continue the search in this case because of all the apparent evidence demonstrated that the premises had two separate businesses. *See Garrison*, 480 U.S. at 86-89. "Put simply, the good faith exception to the exclusionary rule does not apply in this case because the officers did not act in good faith." *See Rogers*, 2013 WL 435946, at *5 (finding the good faith

exception does not apply when officers act unreasonably). This is because "[w]hen officers execute a warrant in a manner that offends the Fourth Amendment…there is no 'objectively reasonable good-faith reliance.'" *United States v. Loe*, 248 F.3d 449, 460 (5th Cir. 2001); *see also United States v. King*, 227 F.3d 732, 754 (6th Cir. 2000) (holding that search of basement was beyond the scope of search warrant; such a search is a warrantless search; therefore, error on part of the district court in finding that the good faith exception to the Fourth Amendment exclusionary rule was applicable to save such a search); *Muse*, 729 F.Supp.2d at 913.

As explained, federal agents acted unreasonably and cannot rely on this exception on these facts. The agents were clearly put on notice that MDPA and LLS were separate medical businesses at the time the warrant was executed. This belief was only highlighted upon her conversation with Hochman. Federal agents chose to ignore this possibility, and did not seek clarification from AUSA or additional authorization from a magistrate judge to continue the search, nor was the search limited to the LLS clinic. These actions were unreasonable based on all the available evidence at the time supporting Hochman's position. The good faith exception cannot apply to unreasonable behavior, as that is the type of behavior the exclusionary rule is meant to deter; and the Government conceded as much at the hearing.[19]

---

[19] At the hearing on March 3, 2025, Defense Counsel brought up the issue of whether the search of the storage shed was reasonable. (FTR Log Notes, 2:00 Afternoon Docket, March 3, 2025, 2:36:48-2:50:20 p.m.; 2:52:55-2:55:37 p.m.). As noted, the premises had a separate and distinct storage building in the back of the parking lot. When testimony was heard on February 25, 2025, evidence was presented that the storage room in question contained files of both LLS and MDPA. (Hrn'g Tr. at 139; *see also* Dkt. No. 113-4 (G.E. No. 4) (Photograph of storage room)). While the search warrant did not list specific curtilage or outbuildings connected to the main building in question, search of a storage building connected to the primary building is reasonable. *See United States v. Olinde*, No. 04-31061, 2006 WL 1049048, at *3-4 (5th Cir. Apr. 20, 2006); *United States v. Babin*, 817 F.App'x 23, 25 (5th Cir. 2020). And, unlike the MDPA offices, as discussed above, at 5313 N. McPherson Road; there is nothing on the storage building indicating it is a separate business from LLS. (Dkt. No. 114-18 at 1 (D.E. No. 12) (Statement of Rosana Cantu, billing supervisor for the medical practice, noting that "Dr. Hochman stores older patient files in the locked building, which must be locked at all times for security purposes. That building has no windows but has electricity.")).

## IV. CONCLUSION

Defendant's Motion to Adopt and Convert to a Motion to Suppress Motions and Related Pleadings filed in Misc. No. 5:19-mc-894 (Dkt. No. 66) is **GRANTED** and Defendant's Amended Motion to Adopt and Convert to a Motion to Suppress (Dkt. No. 84) is **GRANTED**. After careful consideration of applicable law, pleadings, and witness testimony, the undersigned recommends Defendant's Motion to Suppress (Dkt. No. 105) should be **GRANTED** because agents exceeded the scope of the warrant. Accordingly, it is recommended that all evidence obtained from Michael Hochman, MD, PA, should be **SUPRESSED**.

***Notice to the Parties***

The Clerk shall send copies of this Report and Recommendation to Defendant, who has fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file written objections to the proposed findings and recommendations contained in this report within 14 days after service shall bar an aggrieved party from *de novo* review by the District Court of the proposed findings and recommendations and from appellate review of factual findings or legal conclusions accepted or adopted by the District Court, except on grounds of plain error. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2); *see also United States v. Huerta*, 770 F.App'x 169, 169-70 (5th Cir. 2019).

The Clerk shall provide copies of this order to counsel for each party.

**DONE** at McAllen, Texas, on 18th day of April 2025.

Juan F. Alanis
United States Magistrate Judge